UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:12 CR 131 RL |
| | ) | |
| JACK ALLAN SCHAAP | ) | |

**GOVERNMENT SENTENCING MEMORANDUM**

Comes now the United States of America, by David Capp, United States Attorney for the

Northern District of Indiana, and Jill R. Koster, Assistant United States Attorney, to address

Defendant's Sentencing Memorandum, filed January 3, 2013, DE # 19, the Presentence Report,

DE # 30 (hereafter "PSR"), and to respectfully request that the Court sentence Defendant to serve

a ten-year period of incarceration followed by a ten-year period of supervised release.

**A.**     **Defendant's Excuses For His Criminal Conduct Should be Disregarded**

Defendant and many who have written to the Court on his behalf seem to want to explain

or perhaps even excuse his criminal conduct because, at the time he committed his offense,

Defendant was supposedly suffering from "extreme stress, exhaustion, depression, burn-out, and

several other medical maladies."  DE # 19 at pp. 3-4.  Defendant discusses the financial

challenges faced by the church at the time and asserts that those factors caused him to have to lay

off dedicated workers and assume additional responsibilities beyond those he carried as Pastor of

Hammond Baptist Church and as Superintendent of its schools.  *Id.* at p. 4.  Specifically,

Defendant claims that during this time-period he was often required "to work 100 hour weeks

with no breaks in his schedule."  *Id*, p. 4.  Defendant and his supporters have also taken pains to

tell Probation and the Court that at the time of his criminal conduct in this case, Defendant was

suffering from "complications with his prostrate [sic], including chronic and acute prostatitis, as well as near zero lithium levels in his blood." *Id.* Although the above quotes were derived from Defendant's sentencing memo, many of his supporters echo these same "facts" in their letters in seeking leniency from the Court at sentencing.

Many people – if not most people – deal with extreme stress, exhaustion, depression and even burn-out at some point or another in their lives. If the presence of a temporary ailment during the commission of a crime justified leniency at sentencing, there would be no end to the tales of woe presented to this Court. And were the relative "woe" of such tales to be ranked, the government suggests that this Defendant's tale would linger in the bottom tenth percentile of criminal defendants. Whatever stress Defendant was under as a result of his chosen profession and whatever exhaustion or burn-out supposedly resulted therefrom was all self-inflicted; Defendant was free to step down from his position as megachurch pastor at any time. Similarly, Defendant's supposed low lithium levels and prostatitis would only be relevant in this case if those ailments were linked, in reputable medical studies, to engaging in criminal behavior of a sexual nature with a minor child. Since no such studies have been submitted by the defense, the Court should disregard those excuses as well.

But more importantly, the Court should reject Defendant's attempt to "explain away" his criminal conduct because his attempt falls flat when considered in the context of the actual evidence collected during the government's investigation. Defendant *chose* to "counsel" the victim and, once their sessions began, he *chose* to meet with her for longer durations and with increasing frequency over time – from a few hours per week in April and May 2012, to semi-weekly in June and then daily or several times a day in July. PSR, para. 31. The FBI's analysis

2

of Defendant's phone records revealed that during the 31 days prior to the discovery of his criminal conduct, Defendant and the victim spoke on the phone or texted one another ***approximately 662 times,*** with Defendant initiating their first contact of the day on ***26*** of those 31 days.  PSR, para. 37; *see also* Exhibits 1 and 2 hereto (setting forth call and text activity between Defendant and the victim).  Defendant also *chose* to arrange to have the victim transported to Illinois twice in June and to Michigan once in July so they could spend extended periods of time – up to 36 continuous hours – alone together.   PSR, para. 34.

On each trip to Illinois, at Defendant's direction, the victim was dropped off at the forest preserve where Defendant had told his staff he went each Wednesday to "spend time with God walking and praying."  PSR, para. 29.  The victim testified that after walking around the forest preserve for a while during her first Wednesday trip, Defendant took her to McDonald's and then to his home in Crete, Illinois.  PSR, para. 32.  Law enforcement was able to recover[1] from Defendant's phone photographs taken at his property in Crete which feature Defendant grinning like a Cheshire cat while rubbing cheeks with the victim, and, in another shot, engaging the victim in what one witness described as a "very romantic lip-lock."  PSR, para. 17.  If Defendant was suffering from prostate-related pain at the time, it is not evident from the look on his face in the photos.  Indeed, rather than spending that time alone with God, Defendant chose to spend it engaging in sexual activity which constitutes Criminal Sexual Assault under Illinois law due to

---

[1] The photos had to be "recovered" because a forensic examination of Defendant's computer equipment revealed that prior to law enforcement's seizure, he downloaded an image-deleting iPhone "app" and deleted the pictures.  PSR, para. 37.  Thanks to forensic software, law enforcement was able to recover the deleted image directly from the application software.

Defendant's position of trust vis-a-vis the then-16/17 year-old[2] victim.  *See* PSR, paras. 32-33, 35 and 47; 720 ILCS 5/11-1.20(a)(4).

Likewise, after having a trusted staff member[3] obtain permission from the victim's parents to transport her to Michigan for what Defendant had said would be a "girls' time out," Defendant arranged to pick the victim up just across the Michigan border and drive her to his cabin in Cadillac, Michigan.  PSR, paras. 29, 34.  Defendant spent the rest of the first afternoon and evening alone with the victim before returning her to the hotel room shared by the church staff member and her daughter.  PSR, para. 34.  The next day, Defendant picked the victim up around noon but neglected to return her until ***the following evening*** – 36 hours later.  *Id.*  When the victim did not return to the hotel room she shared with the staff member and her daughter by 11:27p.m. on the second night of the trip, the staff member texted Defendant saying she was about to send out an amber alert on Facebook.  PSR, para. 24.  In his response ***thirty minutes later***, Defendant falsely claimed that the victim had fallen asleep on his couch before dinner and that he would take her back to the hotel after she awoke the following morning.  *Id.*  Defendant

---

[2] The victim turned 17 on the second Wednesday Defendant arranged for her to visit him in the forest preserve in Illinois.

[3] This individual is a 63 year-old married woman who had attended First Baptist Church for over 40 years.  Prior to asking her to transport the victim, Defendant confided in this staff member that the victim was in an extremely vulnerable state, had been engaging in self-destructive behaviors, and that Defendant needed to spend extended periods of time alone with the victim in order to "save" her – literally and spiritually.  PSR, para. 29.  Defendant acknowledged to the staff member that if he spent too much time alone with the victim at the church, questions would be raised.  *Id.*  So instead he asked the staff member to transport the victim to Illinois for what he called "counseling" sessions.  *Id.*  Regarding the trip to Michigan, Defendant invited the staff member to bring her own daughter along with the victim at his expense and claimed that his intention was merely to "touch base" with the victim while they were all in Michigan.  *Id.*

added: "Please trust me.  I will go to sleep in my bedroom.  Obviously a 'unique' situation.  If she wakes up I'll take her Back.  Call if u need to.  I have marginal service right now."  *Id.* Defendant did not return the victim to his staff member until approximately 9pm the following evening.  *Id.*

Despite his claims to the contrary, the government recovered photos taken inside Defendant's Michigan cabin which feature a once again grinning Defendant lying with the victim on a couch in an intimate pose and also french-kissing the victim while touching her in a sexual manner.  *Id.*  Once again, if Defendant was suffering from prostate-related pain at the time, the pictures show no sign of it.  Text messages exchanged by the two on the morning of their second day in Michigan feature Defendant telling the victim "Yesterday was 'off the charts.' :))) today...Well even better?!  Love you soooo much.  See you soon."  PSR, para. 19.  While in his Michigan cabin alone with the victim, Defendant engaged in sexual activity which constitutes Criminal Sexual Conduct in the Third Degree under Michigan law due to Defendant's position of trust vis-a-vis the victim.  *See* PSR, paras. 34, 35 and 48; MCLS 750.520d(1)(e).

Indeed, even during the church's annual youth conference, which took place shortly after their return from Michigan in July 2012, Defendant managed to find time each day to spend alone with the victim.  PSR, para. 35.  Not even the fact that a ***youth conference*** was taking place at his church deterred Defendant from repeatedly engaging in sexual activity prohibited by Indiana law with the minor victim ***while the two were in his office at the church***.  *See id.*; PSR, para. 49; Indiana Code 35-42-4-7.  The only way Defendant could have been working 100-hour weeks during the time-period investigated by the government is if he's counting the many hours he dedicated to grooming and sexually abusing the victim.

When his staff became concerned that he was spending too much time with the victim, Defendant called a meeting at which he vehemently denied – repeatedly, and directly to their faces – engaging in any inappropriate conduct with the victim.  PSR, para. 18, 27.  Defendant then tried to "explain away" the victim spending so much time in his church office during the youth conference by telling his entire staff that the victim was on her menstrual period at the time and needed to rest on his office couch.  *Id.*  Within a few days of that meeting, the photos of Defendant and the victim in Michigan were discovered by a member of his staff and, once shown to the church's leadership, precipitated Defendant's firing and law enforcement's investigation. PSR, paras. 17-27.  Based on these facts, one has to wonder whether, had Defendant's intimate relationship with the victim ***not been documented*** in photographs, texts, cards and letters, he would be admitting its occurrence today.

In the end, when considered in light of the actual evidence collected by law enforcement in this case, the excuses made by Defendant and many of his supporters in an attempt to "explain away" his criminal conduct are simply not believable.  Rather than stress, exhaustion, depression or medical maladies causing Defendant's criminal conduct, the findings of the government's investigation suggest that it was lust, hubris and poor judgment that prompted Defendant's much-deserved fall from grace.

**B.**     **Defendant's Letters of Support Should Be Read In Context**

Rarely does a sentencing court receive 20 letters of support on behalf of a Defendant, much less 141 and counting.  The government acknowledges that the letters submitted to the Court on Defendant's behalf help to shed light on his many prior good deeds within the local community and elsewhere.  The government does not wish to diminish those good deeds nor

6

distract the Court from considering them; as the Court well knows, Defendant's history and characteristics is a key consideration at sentencing pursuant to 18 U.S.C. § 3353(a). And there can be no doubt that compared to many defendants sentenced by this Court, Defendant has worked hard throughout his life to build a ministry devoted in part to helping others.

Having said that, the letters submitted on Defendant's behalf go beyond describing Defendant's commendable conduct – they also urge the Court to show leniency to Defendant when sentencing him for the instant offense. For that reason, the government wishes to make two brief points for the Court's consideration about the letters and the individuals who wrote them. First, it is clear from the content of the letters that the writers do not know the full extent of Defendant's criminal conduct in this case and therefore cannot appreciate the magnitude of the harm that conduct has and will continue to cause the victim and her family. In the words of Martin Luther King Jr., "Nothing in the world is more dangerous than sincere ignorance and conscientious stupidity." The sentencing recommendations made to the Court by the letter-writers should be considered with that in mind.

Second, the letters underscore Probation's finding that Defendant was in a position of public trust prior to and during his commission of the offense in this case. PSR, para. 61. In letter after letter, the writers describe how, as Pastor of First Baptist Church of Hammond or in his many previous leadership roles within the church and its educational affiliates, Defendant was in a position of great power within the community and was able to bring about real change. Defendant's congregation, which included the victim and her family, placed their faith – literally – in his hands and trusted him to actually practice what he preached. Defendant abused that position of trust when he committed the crime for which he now stands before this Court.

7

**C.**      **Defendant Took Advantage Of A Vulnerable Victim**

Although Defendant's criminal conduct abused the trust placed in him by many people, it harmed and will continue to harm no one more than the victim and her family.  Probation has found that the victim in this case was "particularly susceptible to this offense due to her mental state" and that Defendant "knew or should have known the victim of the offense was a vulnerable victim."  PSR, para. 60.  Defendant does not dispute that finding, and for good reason.

In April of 2012, an e-mail was sent to Defendant from an administrator at the victim's high school.  The purpose of the e-mail was to ask Defendant to counsel the victim, whom the administrator described as "frightened, confused, and emotionally traumatized" and was known to engage in self-destructive behaviors.   PSR, para. 15.  The e-mail went on to explain that the victim "still has a very tender heart and . . . is still very teachable and moldable."  *Id.*  The writer states that he asked the victim to "allow a few, much wiser people, to take the 'steering-wheel' of her life right now and make the right decisions to get her back on track" and the victim responded that she was "willing to trust her leaders."  *Id.*  The government knows Defendant received and read this message because his secretary testified under oath that she remembers printing it out and ***handing it directly to Defendant***.  PSR, para. 29.  Approximately one week later, Defendant asked his secretary to set-up an appointment so he could start to "counsel" the victim.  *Id*.

During the "counseling" sessions that followed, the victim talked openly with Defendant about the troubles she was having – and particularly about her prior romantic relationship with a young man who had refused to give her attention and affection and yet whom she missed dearly – and the unhealthy ways she had been coping with those troubles.  PSR, paras. 31-32.  In

response, Defendant began to fill the void left by the victim's prior love interest.  He spent more

and more time with the victim, he complimented her profusely, and he encouraged her to view

him as not just her Pastor but also as her friend and, eventually, love-interest as well.  By mid-

June, the relationship between Defendant and the victim had became sexual.  When the victim

turned 17 toward the end of June, Defendant gave her a birthday card with a message that read:

> I can't get you out of my mind.  I keep thinking about how much I enjoy talking
> with you, how great you look when you smile, and how much I like your laugh.  I
> daydream about you off an on all day, replaying pieces of our conversation . . .
> laughing again about funny things you said or did.  I've memorized your face and
> the way you look at me . . . it melts my heart every time I think about it.  And I
> catch myself smiling when I imagine what will happen the next time we're
> together.  You must be something really special, because I can't remember the last
> time I felt so strongly about someone.  Even though neither of us knows what the
> future holds, I know one thing for sure - you're one of the very best things that's
> happened to me in a long time.

PSR, para. 39.

Thereafter, Defendant hand-wrote two letters to the victim.  The letters illustrate the close

friendship and strong romantic feelings that Defendant professed to have for the victim.  Scholars

– religious and otherwise – could long debate the intended meaning within these writings.

Rather than speculate, the government quotes the text of the correspondence here.  The first

handwritten letter reads:

> Hi [Jane Doe],
>      Because my time with you is so limited, I find great comfort in writing to
> you.  Certainly it is no substitute for being with you - nothing is - in fact, being
> with you is unlike anything I have ever experienced.
>      You have a gift of making me feel more alive and more happy than I have
> ever felt!  THANK YOU!
>      I've been doing much thinking about you - our brief journey together has
> been like a spiritual allegory (a story that illustrates a truth :) . . . Your life began
> to deteriorate w/ actions + activities that were self-destructive + that would have
> brought great tragedy eventually.  Then, as your Pastor, I began to counsel you +

[unintelligible] you to God, the truth, and to a better path of living - that's what we call Righteousness. Almost immediately, I felt such a profound tug in my heart for you - an intense desire to pull you away from destructive habits + to pull you into pure love + acceptance. I felt the only hope I had to truly make that difference was to pull you 1st to myself - if I could get you to trust me + open your heart to me. I could not have anticipated or hoped for what happened. You opened your heart wide to me - you made me more than a Pastor/Rescuer - you made me your friend your confidant, your beloved. You gave me your trust, your heart, your love, + your affection. [Unintelligible] must feel when a sinner makes Him more than a Savior - he/she makes Him a beloved lover + friend. I have never felt so truly loved in my life. It is a feeling that is incomprehensible! (off the charts)

In our "fantasy talk," you have affectionately spoken of being "my wife." That is exactly what Christ desires for us. He wants to marry us + become eternal lovers!

I tried to craftily catch your heart so that I could lead you into a better life. You have caught my heart + I have never felt so loved by anyone! Thank you [Jane Doe]. Thank you for the privilege of helping a struggling teenager. Thank you for opening your heart. Thank you for your trust. Thank you for your love.

My hope and prayer is that someday you will comprehend what an impact you have made on your Pastor and friend.

[Jane Doe] you have such a wonderful life ahead of you. I must be careful not to spoil that with any of my selfish fantasy desires. It would be grossly unkind to you for me to hold you captive in any fashion.

When we get scared, Jesus sends His spirit to live within us. But He does not personally live with us. He waits until we have fully matured before he takes us to Heaven to live with Him.

Yes, there are exceptions, but they are exceedingly so - sorta like [name redacted] (sp?) or a young child dying too young.

I must follow the example of Christ. I have espoused you to Him as a chaste virgin. You are pure + lovely + perfect in His eyes. Now you must mature in His grace until the time he brings you to Himself.

Until then, I am here to guide you + help you. [Unintelligible] your heart. I could only wish you would carry my love for you with you + in you forever. For me to wish for more would only be hurtful to the beautiful life He has planned for you.

**I will die 10,000 deaths knowing I cannot have you in my life as I would desire. But I would far rather die those deaths than to hurt you in any way by injuring your future.**

I would gladly do anything for you + I must lay down my life - my desires - for you.

I will ALWAYS be here for you [Jane Doe]!! Always And I will carry you in my very soul as a part of me forever. I've never met anyone like you.

10

Please keep on becoming what you are becoming now.  I've tried to point you in the right direction.  PLEEEAASSE don't ever go back to what you were when we found each other.  That would put my soul in Hell!

I promised you I would do anything to help you - and I have shown you what I mean by that.  I still promise you I would do anything TO HELP YOU but I cannot do anything that would hurt you!

Text me from time to time- stop by to see me when you can + let me be a part of your life + decision-making.  But live your life - the life God has for you.  Be 17 + enjoy this great stage of life.  I'll always be watching + always be pulling for you.  I will always love you - FOREVER!  Your BFF, Pastor.

PSR, para. 41.  The second handwritten letter has a note at the top which says "Thought you would enjoy having my Bible Art from our Bible Study!  LOL" and reads:

Hey Baby,

Hope you slept well.  I'm sitting at my table reading the Words that help me through powerful emotions that are surging through me.

I miss my Bible Reading partner.  It was fun to have our Bible Study yesterday morning.  I Have my good music on - "I will trust in You" + the "Power of the Cross."  Good music drives me to the Scriptures to find the strength to go forward when my emotions want me to "freeze" time + go back to yesterday.  No matter how glorious the past, the future is the only direction we can go without dying inside.

The past 3 days w/ you were beyond my imagination :!  But what I hope you take from this wk. is more than the "magic" we enjoyed but also some better understanding of how incredibly important + special + awesome you are to Jesus!  I wanted you to feel + know how much He loves you!  I wanted to let some of the hurt + headache - the bad hurt - out of your heart.

This week, [Jane Doe], I tried to climb into your heart and write the graffiti of the Gospel on the walls. I wanted to spray paint in Neon colors that you are Priceless + Precious + are "off the charts" important - yes - to me personally - but especially to OUR Savior Jesus Christ.  I'm reading my Bible now to draw a little closer to God - even if it's a millimeter closer - because if we both get a little closer to Him, we also get closer + stronger + deeper w/ each other.  Every relationship not built around that truth eventually must die - that's what happened w/ you + J.  And that's why afterwards you pursued "dead" things + "dead" relationships.  My passion this week was to show you a living relationship + how to keep it alive!

[Jane Doe], however, whenever God takes our love, we never have to [unintelligible] to each other.  Keep pursuing Good and we keep living because He is Life!!

I have a special gift for you that I want to give you Sunday if you would

11

stop by my office when you arrive.  Also, I really want you to download the App Olive Tree Bible Reader when you get it, I'll teach you how to use it.

These days w/ you are tattooed on my heart + in my mind - Forever!  But these days, also gave me great insight to the profound needs of my teens + young adults.  You've helped me.  Finally, I want to thank YOU for giving me something I was not planning to receive.

Through you, I have felt very loved by God.  I gave Him my heart when I was 5, I gave Him my life when I was 17.  And yes I love Him + know Him + understand much about Him, but, sometimes I just need to "feel" His love in a way that only He can provide . . . and this week, through you, I have "felt" His love.  I absolutely cannot thank you enough!!  It is obvious to me that God must trust you very much.  He gave you the work of caring or ministering to His servant - just as the angel ministered to Jesus in the Garden of Gethsemine.  Of course, you have been given enormous responsibility.  The Scriptures do not tell us what the Angel said, how he arrived or how he left + apparently no one knows to this day - 2000 years later - what happened.  That's a very wise Angel!  And so are you, Baby!  1432444!!!!![4]

PSR, paras. 42-43.

The government submits that ***any*** 16 to 17 year-old girl placed in the victim's vulnerable shoes and showered with attention and affection from Defendant – whom she had practically been taught to worship – would have ended up in exactly the same position as the victim in this case:  in love with Defendant, the ultimate hypocrite.

**D.**   **Defendant's Conduct Has Caused Irreparable Harm to the Victim and Her Family**

The government has submitted under seal numerous impact statements to the Court from the victim, her parents, various members of her family, and from family friends who have witnessed the damage caused by Defendant's conduct.  One of the victim's uncles writes that he watched the victim "go from an outgoing teenager to a girl who was broken and cried at the drop of a hat."  As a result of the victim having to change schools, he explains, she lost the

---

[4]According to the victim, "143444" was code the two of them used to say "I love you very very much" (where the numbers correspond to the number of letters in each word).

opportunity to hang out and graduate with her life-long friends.  A co-worker and friend of the

victim's mother explains that she "used to be an enthusiastic and happy worker and now all you

see is pain in her eyes."  Of the victim, this friend writes:  "she used to go happy to school and

she was a student with good grades," whereas now her grades have deteriorated significantly.

The victim's family provided the government with copies of the victim's report card from

Hammond Baptist High School, which showed "A" and "B+" averages each quarter, and a recent

progress report from her new public high school, which shows that she is failing several subjects

and earning a "C" in another.  In the words of this family friend:  "[Defendant] has broken her

down; he has taken her smile, her happiness, her spirit."  An aunt of the victim also wrote to

express concern about the fact that the victim "can't sleep most nights." "I can see her suffering,"

her aunt explains.

      The victim's parents' letters shed even greater light on the effect Defendant's conduct has

had on their family.  The victim's father explains that he first visited First Baptist Church when

he was eight years old, and he started regularly attending services there at the age of 14.

Although he was living in Chicago at the time, he moved in with a family in Hammond so he

could attend Hammond Baptist High School as well.  It was there that he met the victim's

mother, his future wife, who was similarly staying with a family in Hammond so she could attend

the school.  They married in 1982 and moved from Chicago to Hammond, where thereafter they

raised their family and attended First Baptist Church.  The victim's father writes:

> We worked hard to have all four of our children enrolled in the Christian junior
> high, grade school and kindergarten.  My wife and I took on side jobs and made
> sacrifices so [our children] could benefit from the Christian school.  It made us
> feel good that they were in a Christian environment, with Christian friends, and
> with teachers that cared about them, would pray for them, and serve as good role

models.  We felt this was a safe place where they would learn about God.

[After the victim began her counseling, she] told us she met with [Defendant] and he asked her how she was doing.  Shortly thereafter my wife and I met with [Defendant], and he told us he wanted to continue "counseling" [my daughter].  We met with him several times over the next couple weeks and he told us [she] was doing great.  We believed our daughter was safe when she was at FBC and with [Defendant].  We trusted the leader of our Church and his staff completely.

My wife and I raised all of our children in a Baptist home.  The rule of our house was that the pastor was God's representative on earth.  Always do what the pastor says.  We taught our children to have implicit faith and trust in pastors.  I never imagined such emotional and psychological harm could be inflicted on our daughter and family by a man and Church I respected and trusted.

I will never forget how [Defendant] looked me in the eyes and lied to me and told me how great my daughter was doing.  I know he lied to me the same way he lied to [my daughter].  He was able to use his power and position as Pastor to manipulate her and take advantage of her trust in him and faith in God.  There is no doubt in my mind that [Defendant] carefully planned every detail of his crimes.  This is not something that just happened.  It is sickening to me that a man who claims to be a messenger of God, with a daughter of his own, would take advantage of a young girl in such an evil and immoral manner.

Our main concern is to care for our daughter [].  She is very upset and confused.  As her parents, my wife and I struggle each day to find the words to ease her pain and help her cope emotionally and mentally with all that has occurred.  She has been forced to make so many changes in her life all at once because of his horrible crimes. [She] had to change schools, and leave the friends and teachers she has known her whole life.  She was forced to attend a public school, where she knows no one, and has gone from an A student to failing several classes.  Our entire family has been banned from the FBC, the church we have attended our whole life.  Our extended family has stopped going to FBC because of the false and hurtful things they have heard about [my daughter] from other church members.  [My daughter] is depressed and cannot sleep.  She often sleeps with my wife and I so she can stop crying and feel safe.

The victim's mother writes that she and her husband have been married for 31 years and have four living children – three boys and one girl.  When he was seventeen, one of the victim's brothers was diagnosed with cancer and for three years, the church and school prayed for him and

14

the family.  During that time, Defendant saw them many times for counseling and prayed and

talked them through that difficult time.  She goes on to explain:

> For more than thirty years, my husband and I have helped the Church in many
> different ways.  Ten years ago we won a trip to China with [Defendant] and other
> staff members for ten days.  During this time, we became very close with these
> people and enjoyed doing good work on behalf of our Church.  All of our children
> participated in Church and school activities.  As a young child, [my daughter]
> went to [Defendant's] house with her teacher.  Her teachers at school taught all of
> my children to love, respect and obey the pastor and that he is a man of God.
>
> . . . .
>
> It has been extremely difficult for [my daughter] and our family to deal with the
> emotional and psychological harm caused by [Defendant] and his staff.  [My
> daughter] is very upset and confused by all that has happened.  She cries daily and
> is depressed by all the changes she has had to endure because of his crimes. . . . .
> Her pain and suffering over what has happened has caused her to feel ill and miss
> school.  Her grades have dropped and she cannot sleep.  As her mother, I only
> want to ease her pain and help her understand this is not her fault.  I want [my
> daughter] to get the help that she needs to heal from this unimaginable harm
> caused by [Defendant].
>
> It is so hurtful to hear people say bad things about my daughter and our family.
> We did nothing wrong.  Pastor Eddie Lapina told my husband and I that it was
> best we did not go back to the Church for our safety.  We devoted our lives to
> First Baptist Church and they have now abandoned us because of the horrific
> crimes committed by [Defendant].  My daughter is the victim.  Not him.  We have
> been unable to attend any church because of what he did to our daughter.  It is
> very hard for me to go and listen to a pastor and put my trust in him.

> And finally, the victim has written two impact statements for submission to the Court.

The first is directed to the Court and the second is directed to Defendant.  In the former, the

victim explains:

> My entire life the Church has been my universe.  Growing up, I watched
> [Defendant] in Church, listening to his sermons three times a week.  I was raised
> by my parents and teachers to trust and obey my pastor.  He was a celebrity to me,
> a father figure, and a man of God.  I was taught to see him as one of God's
> messengers.  I felt the most safe when I was in Church.  I first met [Defendant]

15

when I was in kindergarten, and still had my baby teeth.

As my pastor, I sought guidance and counseling from [Defendant] when I was in need of help.  He told me to confide in him, to trust him, and he made me feel safe and comfortable around him as a man of God.  [Defendant] preyed on that trust and my vulnerability.  He used his power, influence and charisma as pastor to make me feel safe.  He told me I was special, that he loved me, and that he wanted to marry me.  He told me that I was his precious gift from God. He is so twisted to have lied to me and manipulated me.

[Defendant] violated my trust.  But when it was being violated, I didn't even know it because he made me believe what we were doing was okay and right in the eyes of God.  When I asked him if it was wrong, he told me no, and that I was his precious gift from God.  I felt so special when he texted me from the holy alter during his sermons. . . . His lies and deception made me feel closer to him and to God.

. . . .

Shortly after submitting the impact statement excerpted above, the victim also provided the

government with another statement that reads as a letter to Defendant.  It states:

I came to you because I was having a hard time.  I know that I could open up to you and tell you anything because in church that is what we were taught our whole lives.  We are taught that our pastor is a man of God. He is who God chooses to help us.  I looked up to you so much.  You were such a good counselor.  I trusted you.  I opened up completely to you.  You knew that I was hurt, extremely vulnerable, and had no self-esteem and you took advantage of that to get closer to me.  It worked.  We got really close!  You made me feel safe.  You made me feel like I could come to you with anything and you would help me.  You knew me more than anyone.  You knew me better than I knew myself!  You knew that I would do anything you would tell me to.  When you first kissed me I was shocked.  You honestly caught me off guard.  I didn't think that it was real.  When I asked you if it was wrong, you said "No".  You told me that I was sent to you from God, I was his gift to you.  You made me feel special.  You told me that I could give you something that no one else could.  By the time that I realized that maybe this wasn't ok, you had already made me fall in love with you so I didn't care, I didn't want to stop.  Those four months were off the charts!

This has been extremely hard to go through but it has been a journey for me.  First I was in love with you and I would not admit that I was a victim.  I honestly believed you loved me.  I also felt so guilty and partially responsible, like maybe it

16

was my fault.  I know now that is not true.  We know that I did not do anything but trust you like everyone else did.  Then I became really angry towards God.  For a second I did not believe in God. I thought there can't be a God because he would not let this happen and if there is a God, I hate him because he did let this happen because you told me that he was ok with this.  I couldn't even say the word God, let alone, hear it.  But God didn't do this to me you did and I'm not going to blame God for it.

You said that you didn't want to hurt me.  You did not just hurt me.  That would have been bad enough.  You hurt my entire family.  We all trusted you.  We went to church for our entire lives.  Now, I am in counseling to deal with the constant anger, sadness, guilt, and shame that I feel.  I have come a long way.  I have had to leave my friends and teachers that I have known my whole life and start a new school which has been really hard.  Every day is a challenge for me because every day when I wake up I don't want to get out of bed.  I want to push pause because I do not want to go on with my day because I do not want to have to deal with this stuff.  I didn't ask for this to happen.  I didn't want this.  You did.  I don't want to feel sad, ashamed or hurt anymore.  I want things to be normal again.  But I do get up and go on with my life no matter how hard it is.  I know that I am strong enough to handle it.  This has majorly affected my life but it hasn't ruined it.  I'm going to get through this and grow from it.

As mentioned in her letters, the victim has been participating in regular psychotherapy to help her cope with this incredibly difficult situation and her evolving feelings for Defendant. Undersigned counsel has met with many victims during the time she has been prosecuting sex offenses but has never before worked with one who was groomed and sexually abused by a religious figure who expertly used his "inside track" to God to justify his illegal conduct to his victim.  That psychological component of Defendant's abuse of the victim appears to have caused as much or more harm to her than the physical component.  Although the victim's attorney has worked with the medical professionals treating her in an attempt to determine the total amount of future treatment she will need, they have reported back that it is simply too early in the process to be able to reach that conclusion.  Without an understanding of the amount of future treatment needed, the economist with whom victim's counsel is consulting cannot provide

17

a calculation of the present day cost of her necessary future treatment.  Rather than ask for

another continuance of these proceedings in hopes of reaching some conclusions on those issues,

in the interest of allowing the victim to put this chapter and, importantly, Defendant behind her,

they have withdrawn their request for restitution and indicated that they will seek compensation

pay those expenses through other legal channels.

**E.       The Plea Agreement Was In the Best Interests of the Victim and the Government**

Defendant pled guilty pursuant to a pre-indictment plea in this case.  In the plea, the

government agreed not to bring any additional charges and Defendant agreed to accept

responsibility for his criminal conduct in Illinois, Michigan and Indiana.  Both parties agreed to

recommend that Defendant receive a sentence of incarceration of ten years.  Because the

agreement was offered pre-indictment, by accepting it Defendant waived his rights to receive

discovery, to challenge the sufficiency of the evidence and the methods used to collect it, to be

indicted by a grand jury, and to be proven guilty beyond a reasonable doubt at trial.  At the time

the plea offer was extended, the government invited Defendant and his attorneys to review the

evidence collected during law enforcement's investigation, much of which is described herein.

That evidence included photographs of Defendant with the victim, transcripts of sworn

testimony from various witnesses including the victim and the member of Defendant's staff who

drove the victim across state lines at Defendant's direction, electronic evidence recovered from

computers, phones and other devices used by Defendant, the phone records of Defendant, his

staff member and the victim showing the amount of their contact as well as their approximate

geographical locations while communicating, the cards and letters written by Defendant to the

victim, and much more.  Defendant was given one week to decide whether to accept the

government's plea offer.  If he had rejected the plea agreement, the government would have sought an indictment and, at sentencing, likely argued for a sentence above the applicable U.S. Sentencing Guideline range.

Importantly, the government's pre-indictment plea offer to Defendant was made not from a position of weakness but from a position of strength.  The government's primary objective for offering Defendant the plea was to protect the victim and her family.  Prior to offering Defendant the plea, the government met with the victim's family and discussed with them the possibility of a pre-indictment plea.  When the victim's parents agreed that a quick plea was in their daughter's best interests, the government walked them through its proposed plea agreement with Defendant in detail, including the offer to recommend a sentence of ten years' incarceration.  It was with the victim's family's consent and agreement to the terms of the plea that the government extended the plea offer to Defendant, which he ultimately accepted.

In the government's experience, it is the period after charging and before a finding of guilt that is most difficult on victims, especially when the victim is a minor who continues to have strong feelings toward the abuser.  The government also knew, given Defendant's former position as megachurch pastor and the press coverage that followed his abrupt firing from First Baptist Church in August 2012, that prolonging that very difficult period for this particular victim and her family would result in a magnification of their suffering.  It is an unfortunate but true reality that when it comes to crimes involving victims – and especially crimes involving minor victims –  the government often must reconcile and temper its desire to argue for the longest sentence possible with its responsibility to protect the rights and interests of the victim and the victim's family.

The government wholeheartedly stands behind its agreement with Defendant in this case. We have met repeatedly with the victim and her family throughout this process and they have expressed satisfaction and appreciation for how this prosecution has been handled and for the ten-year prison sentence the government is recommending.  The victim's family and the government feel that ten years' incarceration followed by ten years of supervised release provides just punishment for, and adequately addresses the nature and circumstances, as well as the seriousness, of Defendant's offense conduct pursuant to 18 U.S.C. § 3553(a)(1) and (a)(2)(A). The government also feels that a ten year sentence, followed by a term of ten years of supervised release, in conjunction with the requirement that Defendant register as a sex offender for the rest of his life, will adequately protect the public from further crimes of Defendant pursuant to 18 U.S.C. § 3553(a)(2)(C), and will afford adequate deterrence to others from engaging in similar criminal conduct pursuant to 18 U.S.C. § 3553(a)(2)(B).  The government's sentencing recommendation in this case is also consistent with pre-indictment agreements it has made in other cases where defendants have engaged in sexual activity with post-pubescent minors.  *See United States v. Jeff Smith*; 2:12 CR 88 PPS; *United States v. Darren Williams*, 2:13 CR 35 JVB. The government therefore believes that if its recommended sentence is given, there would be no unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct pursuant to 18 U.S.C. § 3553(a)(6).

The pre-indictment nature of this plea also served the government's interest of conserving its resources.  As the Court is aware, undersigned counsel is the primary AUSA in the Hammond office of the U.S. Attorney in the Northern District of Indiana prosecuting federal sex offenses against minors and adults.  The timely pre-indictment resolution of this case saved the

government significant time and resources.  Since Defendant entered his guilty plea in this case,

undersigned counsel has been able to charge – by complaint, information or indictment – nine

other defendants with lead offenses as follows:  two defendants (separately) with producing child

pornography of victims as young as 6 years old in violation of 18 U.S.C. § 2251(a); one

defendant with transporting a 14 year-old minor across state lines with intent to engage in

criminal sexual activity in violation of 18 U.S.C. § 2423(a); one defendant with engaging in

aggravated sexual abuse of a minor under age 12 in violation of 18 U.S.C. § 2241(c); one

defendant with engaging in the sex trafficking of adult females in violation of 18 U.S.C. § 2422;

two defendants (separately) with receiving and/or possessing child pornography featuring minors

under the age of 12 in violation of 18 U.S.C. § 2252(a)(2) and/or (a)(4); and two defendants

(together) with the purchase/sale of an infant/toddler child knowing that the child would be

caused to assist another person to engage in sexually explicit conduct for the purpose of

producing child pornography in violation of 18 U.S.C. § 2251A(a) and (b).  Had Defendant not

signed a pre-indictment plea and swiftly admitted his guilt in this case, it is unlikely that

undersigned counsel would have been able to charge all nine of those other defendants during the

same time-frame.  It is yet another sad reality in these cases that because the government's

resources are limited, it must do its best at all times to conserve those resources.  That means that

the government must sometimes prioritize among criminals and their conduct and offer some

defendants a slightly better deal than it would otherwise offer them in exchange for a pre-

indictment plea.  That is what the government did in this case and if it had to make the decision

of whether to do so again today, it would do exactly the same thing again.  As this Court knows,

the government does not make these decisions lightly.

**F.**     **Conclusion**

The plea agreement signed by the government and Defendant in this case calls for the parties to recommend to the Court that Defendant be ordered to serve a sentence of ten years' incarceration.  The government respectfully requests that the Court also order Defendant to remain on supervised release for ten years after his release from incarceration and to include as a condition of his release that Defendant remain registered as a sex offender for the rest of his life.

Respectfully submitted,

DAVID CAPP
United States Attorney


By:     _/ S / Jill R. Koster_____
        Assistant United States Attorney
        5400 Federal Plaza, Suite 1500
        Hammond, Indiana 46320
        (219) 937-5500

22

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2013, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which sent notification of such filing to the following:

Counsel for Jack Allan Schaap

By:     */S/ Jill R. Koster*
         JILL ROCHELLE KOSTER
         Assistant United States Attorney
         5400 Federal Plaza, Suite 1500
         Hammond, Indiana 46320
         (219) 937-5500